Good morning, and may it please the Court. My name is Steve Obermeyer. I'm here on behalf of the private appellants. I have reserved five minutes for rebuttal, and my co-counsel on behalf of the States has reserved five minutes for argument as well. This case involves ATF's regulation of pistol arm braces. An arm brace is an orthotic device with a rubber cuff and a strap that is designed to secure a pistol to a shooter's forearm in order to stabilize firing. After authorizing the use of these devices for over a decade and declaring them, quote, perfectly legal accessories, ATF didn't about-face. It declared in the final rule at issue here that 99 percent of pistols with a stabilizing brace attached are and always have been short-billed rifles subject to the National Firearms Act and the Gun Control Act. You said 99 percent. I thought it was 60 out of 60. Well, those are the pictures in the adjudications that are part of the rule. That's 60 out of 60, but their estimate is that 99 percent of braces would be covered. What they don't say is what kind of brace would not be covered. Okay. That was where I was going. Right. The Fifth Circuit, citing a host of arbitrary and capricious problems with the rule, already held that the rule likely violates the APA. Yeah, but at least maybe I missed it, but I didn't see the same argument that was made in Mock being made here. As I understood Mock, Mock essentially said the final rule and the APA. I just didn't see that argument made here. That's correct, Your Honor. We did not raise a logical outgrowth argument here, but what Mock said was a few things. One is, I think what Mock was basically saying is the reason there's a logical outgrowth problem is because of the arbitrary and capricious aspects of the rule. In fact, in footnote 38 of Mock, Judge Smith says, well, you know, this could have been an arbitrary and capricious case. It wasn't raised that way. I think what he's effectively saying is an arbitrary and capricious problem. He says, for instance, that the rule is conceptually different than the worksheet that was in the notice, in part because it makes things vaguer, creates sort of these vague factors, which are, he says, you know, no individual could understand whether or not their raised pistol was covered or not. But even putting aside Mock, under the Supreme Court's decision in Thompson, lenity demands here that the rule fail because if some braces can be used for shouldering as ATF contends, ATF also expressly ignores that braces have another lawful, quote, useful purpose, and that is supporting pistol firing. And indeed, the agency is flip-flopping on this issue after, quote, misinterpreting, that's their words, the statutes for years, demonstrates that the statutes are at least grievously ambiguous as applied to arm braces. So appellants have shown a likelihood of success on the merits, and we've also shown irreparable harm, and we think that this Court should issue an injunction. Sort of starting from the top, the Court doesn't even need to get to whether the rule is arbitrary and capricious or whether lenity applies because it unambiguously violates the NFA and the GCA. The language of those two statutes is in all material respects the same, so I'm going to focus on NFA language. But that language makes clear that a pistol with a stabilizing brace is neither a rifle nor a firearm under the NFA. And more specifically, the use of the word design in the NFA and the GCA unambiguously renders the final rules express refusal to that is even if some functional braces can be improperly used for shouldering, the Supreme Court has made clear that for dual-use items, the word design must be read to mean principally used by virtue of its objective features, i.e., features designed by the manufacturer. Counsel, do you anticipate that the Supreme Court will provide us more guidance on the meaning of design this term? I am not familiar with design being addressed this term, Your Honor. I apologize. I know that both Hoffman Estates though and Posters and Things are very clear on this. And I'm not sure our brief was as clear on that, but Hoffman says design means principal use. Posters and Things ends up analyzing intent, but it says, well, Hoffman already covered designed and reads it the same way. But doesn't 5845C also say design or redesign, made or remade, and wouldn't the re's be so to speak cover that? I don't think so, Your Honor, because it still has to be redesigned or designed for it to be the principal use of shouldering. And by failing to consider the brace use, it unambiguously can't establish what is the principal use. Yeah, I don't know what the record shows, but just applying common sense, my hunch is that it's used a lot more for shoulder than it is for brace use. The record is really not clear on the amount it's used. Certainly there are examples in the record of it being shouldered. There are also examples in the record of it being used properly as a brace, including from one of the appellants in this case, Mr. Cicero. And the issue is that not only did the agency not look at the brace use, it expressly says it will not look at brace use. So you have this at least dual use item. They can't establish principal use without evaluating the other uses. In this case, the legal use. And that's where they run into a problem. Certainly, well, unambiguously it's an issue with the statute. But even if you disagree with that, then you're just directly in Thompson world. And once you're there, if it has a legal purpose, then lenity requires that we win. My apologies, Your Honor. We've already covered a fair amount of what I was planning to get into here. I do think on the ambiguity point, it is important to consider the agency's changing of position over the years. That's the Hardin case in the Sixth Circuit. Hardin basically says, look, that's a bump stock case. But it says, look, if the agency has been changing positions this much, how could it not be grievously ambiguous? I think that's just common sense. And it's not just that the agency here at one point had some braces as being covered and some not. It's that their whole analysis changed. They focused on brace use for years. Now they're saying, well, never mind. Don't look at brace use. Look at shouldering. And by just keeping that out of the analysis, that's where they create a fundamental problem under the statute and with lenity. And just a few more points on the APA analysis, Your Honor. As I said, the Fifth Circuit has already addressed that there's an APA problem here. We presented a bunch of arbitrary and capricious issues. Mock basically agreed with us, I would say, on almost all of them. I just want to focus on four quickly here. The first is the failure of the rule to provide specific metrics regarding when a brace pistol is used for shouldering. That's most egregious with respect to rear surface area. And this is the EEE rocket case we cite from the D.C. Circuit. ATF failed to explain why it couldn't precisely define rear surface area. It doesn't define it. And the regulated community is left wondering, what is enough for shouldering? The second arbitrary and capricious problem is just the inherent vagueness of the totality of the circumstances test. It's an unweighted six-factor test. Mock, I don't need to say more than Mock's already said, I don't think. There's also the innovator case we cite from District of Columbia. But it amounts to carte blanche for ATF to decide what's a brace. The third APA problem relates again back to the use of the brace as a brace, which is even if you assume they could analyze third-party use properly, they have failed to consider evidence of brace use. And that is arbitrary and capricious failure to analyze that important aspect of the problem. And then the fourth part is the failure to analyze the costs of braces having gone on the market from 2020 to 2022. That's this all costs. They failed to consider those costs. And that's another arbitrary and capricious problem. And I'm almost at my rebuttal time, so unless there are some questions. You mentioned irreparable harm. What's the irreparable harm? I think it's a pretty black letter here under a circuit law. So the company appellants have lost tons of money on this already. That is not recoverable. So under Iowa Utility and Baker Electric, I think that's black letter irreparable in this case. You also have the harm to the reputation, which is the Krupa case from this circuit. The government doesn't even address that in their brief. My client was accused of not acting properly here. That raises the notch of how much it's irreparable harm. So those are I think this court could look at that just based on those cases and find irreparable harm. Thank you. Well good morning, your honors, and may it please the court. Twenty-five states agree that the rule is unlawful and arbitrary. It rewrites multiple statutes to reach its desired result, and it offers next to no guidance to the public or to the states. Even if this court could credit the vague six-factor test that the agencies offered to define braced pistols, ATF defeats the usefulness of those factors by saying its decisions will ultimately rest on a case-by-case basis. The ATF now insists that all this is necessary to quote a federal law. But of course ATF has itself declared these braces lawful for many years. And ATF's choice to now reverse itself, often in entirely unexplained ways, has serious and direct irreparable harm. Quite simply, nothing about this rule reflects rational and appropriate decision-making. The court should therefore preliminarily enjoin the rule just as other courts have. I want to go directly to the arbitrary and capriciousness discussion because I think that really goes to several of the problems that exist within this rule. The agency here has offered up what they call a six-factor test, and they did that mostly because they said it was very important to provide specificity and clarity in the application of these statutes. But that fundamental purpose was in no way served here, and in that way the rule is inherently arbitrary because the agency didn't in fact accomplish the only thing it set out to do. Instead what the rule did is say, we're going to provide you these six things that we're going to consider in some sort of amorphous, ambiguous way. We're not going to give you objective criteria. We're not going to explain to you why we can't provide you objective criteria. And in fact we only might consider these factors, and in that way it may be that the test in fact comes down to something else entirely. And in an individual case-by-case basis, it may be that state police officers, it may be that individuals within the states, it may be that all these folks are possessing NFA-regulated firearms without being any the wiser. And even if you could look past the fact that this is supposed to be sort of an ambiguous case-by-case, may or may not six-factor test, I think what you just heard is some discussion of how each individual factor in and of itself fails to provide the guidance that would be necessary to make this rational decision-making. I think the surface area obviously is one of the most obvious ones. The agency could have provided some sort of analysis as to the actual width or height or something, some sort of metric, or at least explain why they couldn't provide a specific metric. And instead all they give us is, well, we need to maintain sort of an openness, a sort of wild discretion, because otherwise people could circumvent the rule. Well, of course, to the extent that rules have limits and people fall outside those is with Congress. Congress has defined a set of covered firearms. And so to the extent that there's any sort of loophole, it's because Congress made a deliberate choice for that to exist. I think it's also deeply problematic that ATF says that they're going to refer to items like weight, length of pull, and then say that they're going to refer to this undisclosed public database of existing rifles and say, we're going to make an effectively holistic judgment to say, if this is a close enough comparison, it's covered. If it's not based on data that the public does not have, then maybe it's not covered. That's especially problematic from a state perspective, because imagine what we're now supposed to do when it comes to our law enforcement agencies. Imagine a state armory that has a series of weapons piled up in a closet, and we have to go through and try and figure out, is this brace covered? Is this brace covered? Do I have to register this one? There's no real effective way for us to accomplish that task, because we're effectively left guessing by the guidance that the ATF said was supposed to provide perfect clarity in this context. And I think what you heard about in the discussion of the rule of lenity is this is an especially problematic circumstance, given that these laws carry criminal penalties. We're not talking about some minor inconvenience here. Obviously, we as the states have serious burdens in the But ultimately, folks who possess these braces may or may not understand that they are violating criminal law and might go to jail for their possession of a brace. Counsel, I have a question about the record, and you may not be the one really to answer the question. Sure. Does the record reflect how many manufacturers there are of these braces slash shoulder devices, and how many different variations there are? Honestly, Your Honor, I don't have that information. It might be that my co-counsel has the specifics. What I do know, however, is that four of the five largest, at least, are now facing closure because of the effects of this rule, particularly because of the ambiguity of this rule. I think what you've seen is the market has evaporated as people have run away from possessing these braces out of a justifiable fear that they might face criminal sanctions. I see that my brief time has expired, so I appreciate the court and ask that you reverse. Thank you. Thank you, Mr. Williams. Good morning, Your Honors, and may it please the Court. Sean Janda for the Federal Government. I think it's helpful for me to start this morning by just taking a step back to focus on the relevant statutory language and the problem that was confronting ATF when it decided to issue the rule. Under the NFA, Congress has defined a rifle in 2845C as a firearm or a weapon that in relevant part is designed and made or remade and intended to be fired from the shoulder. And Congress has also determined, and this is in A3, that any rifle that has a barrel less than 16 inches is a short-barreled rifle subject to the NFA's regulatory requirements. And as the rule explains at length, and as ATF has said for many years, at least some braced firearms fall under the definition of a short-barreled rifle. They have barrels less than 16 inches, and some of them are, I think, manifestly designed and intended to be fired from the shoulder. We have some pictures of these in our briefs that I think are almost identical to weapons that are designed and marketed as short-barreled rifles. And ATF's experience, as outlined in the rule, is that manufacturers were selling them this way, they were being advertised this way, they were being discussed this way in publications. Do you know the answer to my question about the number of manufacturers and the number of individual models? So I don't know the exact number, Your Honor. The ATF identified in the regulatory impact analysis, and this is at pages 244 to 245 of the appendix, five manufacturers of braces that were not licensees, that manufactured or sold just braces. There may be more manufacturers that make their own braces. Obviously in the slideshows that the plaintiffs also challenge, ATF has identified a relatively large number of different configurations, because you have different brace designs, you also have different heavy pistol designs, and I think when you put them together the number of combinations becomes pretty large. And so the problem facing ATF before this rule is that it had to figure out which of these were designed to be fired from the shoulder and which ones weren't, and it started to approach that problem initially through case-by-case classification layers. As the rule explains, in some of those layers it said that the weapon was not designed to intend to be fired from the shoulder, in the majority of those layers it said that the weapon was designed to intend to be fired from the shoulder. But those classifications ATF came to understand over time were inconsistent, were applying sort of different tests or focusing on different evidence, and had led to a lot of confusion among the regulated public, among the regulated community, about which braces would be captured and which ones wouldn't. From the government's point of view, is there a difference between designed and intended? I don't know that there's a difference in the sense that, you know, you have to show designed and you have to show intended. I think in a lot of ways... I mean, the statute requires them conjunctively, both, but it's not clear to me if there's a difference. I think it's in many ways sort of a legal doublet. I think the design language does focus, as the rule explains, on the objective design features of the weapon, which the rule, I think in many ways, takes pains to identify the particular design features that may indicate that a weapon is in fact designed and intended to be fired from the shoulder. And that focus on those objective design features is comfortably, fits comfortably within that statutory design language. I think it's what the statute is really directing us to focus on. And then the rule also focuses, of course, on intent, as revealed both through the design features the designer chooses, and then also through other evidence, like marketing materials, like public statements, like actual use of the product in the community. And all of those factors, as our brief explains, I think have very strong phases. If you're relying on how something is actually used in the community to determine intent, how is a person supposed to know whether something is legal or not? It seems rather arbitrary. So I think there's a couple things here. Number one is, I think it's almost beyond dispute that, of course, how a product is used is going to be probative of how it was designed to be used. People tend to use things in the way that they were designed to be used. And in any particular case, the evidence of use in the community might be overwhelming, or it might be sort of marginal, it might not be particularly probative. But I think it's hard to say that how people actually use a product isn't even relevant to how the product is designed to be used. And of course, the Supreme Court has said, and we say these cases in our brief, that use in the community is a factor to consider when thinking about a product's designed use. That's imposters and things. I think the beginning of your argument, if I read it right, was designed to suggest there But isn't the vast majority of what we're now talking about are things that are created by, as pistols, which are plainly exempt from the firearm statute, that have been modified with these extensions, and now all of a sudden, all of those are going to be covered, right? So aren't we really looking at a sea change? So I don't think so, Your Honor. I mean, as we explained in our brief, for decades and decades, it's been true that you can often buy the pistol and, for example, a stock separately, and when you buy the pistol, it's not a short-barreled rifle. When you put the stock on it, it becomes a short-barreled rifle, and that's been true for decades. And so the question here is just whether, when you put a particular brace on a particular pistol, you have created a thing, or a manufacturer has created a thing, that is designed and intended to be fired from the shoulder. And ATF has said, even before the rule, as we explained, that many, in response to many particular classification requests, that specific models are designed and intended to be fired from the shoulder. ATF, in the rule, explains that actually the majority of classification requests that they got before issuing the rule, they came back and said, we think this is a short-barreled rifle. And so I think the rule tries to tighten the analysis a little bit, tries to provide guidance and clarity moving forward about what things to focus on and what things not to focus on. But the rule doesn't, I think plants would say, before ATF said these were all legal, and now ATF says they're all illegal. And that's just not true on either end. As before the rule, ATF classified the majority of these as short-barreled rifles, and now after the rule, ATF, I think, expects that most of the designs that have actually been sold are likely to be classified as short-barreled rifles, which I think probably reflects the are designed and intended to be fired from the shoulder because it lets them circumvent the NFA. But ATF explains in the rule itself sort of particular designs that would certainly not be classified as short-barreled rifles. So for example, if you design the brace just to have sort of elastic straps that wrap around your forearm to brace the heavy pistol, that would not be a short-barreled rifle. If you design the brace to have a protrusion on the back to prevent comfortable shouldering, that would not be a short-barreled rifle. And the fact that those sorts of designs are clearly exempt from the NFA but haven't gotten traction in the market. Where is that guidance? Because as I understood it, 60 out of 60 that were put out by ATF were deemed to qualify, and none were deemed not to. So that guidance is in the rule itself. It's pages 121 to 122 of the appendix. And I think there's sort of two things. So one is the slide shows themselves. ATF was trying to inform the public about designs that were covered. So if people had those designs, they would be on notice so that they could register them, which is why the slide shows focus on covered designs rather than sort of a whole range of designs. But then second, you know, ATF does say in the regulatory impact analysis that it estimates that a very large percentage of products actually on the market are likely to be classified as short-barreled rifles. The designs discussed in the rule I think just aren't a dominant part of the market. But the reason for that seems to be that there's just no market for a design that doesn't actually let you shoulder the weapon. Because the overwhelming majority of users of these braces are using them to circumvent the NFA. They're not using them to fire a heavy pistol with one hand. Has ATF generated or does the record reflect that ATF has generated a slide show, as you with attached stabilizing brace designs that it deems to be not short-barreled rifles? So there's no sort of separate slide show showing that, Your Honor. There's a discussion, as in the rule, this is pages 121 to 122 of the appendix, in the rule itself where ATF discusses designs that would not be covered under ATF's framework. And of course, as we explained, the rule itself doesn't classify any particular platform or design as a short-barreled rifle or as not a short-barreled rifle. The rule provides a framework for ATF to use going forward to apply to particular platforms, particular designs. And so I think one of the odd features of this case and the odd features of Plants Challenge is that they're trying to challenge the rule in a vacuum rather than really trying to have a fight about particular weapons. Are there some designs that have not been deemed to be short-barreled rifles? Yes. So the rule itself discusses sort of two possible such designs. One is... I'm not talking about the designs. I'm talking about specific items, specific products. So the rule does not identify specific products. It identifies sort of designs that you could manufacture that would not be covered. I understand. But I think that... I understand that. But I'm asking, does the record reflect or show some products that pass the test, so to speak? Not specific products on the market. But again, you know, I think the reason for that is it manifests throughout the rule is that people don't want to buy... The overwhelming majority of people don't want to buy a stabilizing brace to stabilize a heavy pistol. The overwhelming majority of actual consumers on the market are buying these braces to circumvent the NFA. And the fact that there are designs that very much... How do we know that? So I think there's a couple things around it. I mean, number one is, you know, I think the fact that there are all sorts of designs that would prevent shouldering, that would clearly not be within the ambit of the NFA, and that as far as we can tell, no one is actually manufacturing or selling those designs because no one wants to buy them, I think is pretty good evidence. And I think the other evidence is just throughout the rule, I mean, there are pages and pages of photographs and discussions from gun publications, from sort of people in the regulated community, from manufacturers themselves, that I think make very clear that these sort of were developed and became popular when people understood that or thought that they could use them to circumvent the NFA. And again, you know, to the extent that there's a manufacturer out there who thinks that there's some real market for braces that don't circumvent the NFA that just allow you to brace your heavy pistol, that market, to the extent it exists, could be served by a manufacturer making one of the designs described in the rule or some other design. I mean, the ATF certainly wasn't being exhaustive when it was describing particular designs that may well or would not implicate the NFA. And then the other thing, again, is, as I said before, you know, if the plaintiffs in this case make particular designs or own or would like to own particular designs that they think don't come within the NFA, I think the proper way to raise that challenge would be, number one, to ask ATF what ATF's view is. And then if the person disagrees or the manufacturer disagrees, to bring a suit about that particular weapon. As the rule itself doesn't classify any particular platform, the rule provides a framework that identifies sort of indicia of intent that ATF thinks will be probative when it comes time to classify particular weapons. And you know, ATF is happy to have that adjudicative process happen at the agency and to defend those results in court. And again, in court, as we say, the rule itself is an interpretive rule. It's not binding on a court. A court in such a proceeding would not be applying the rule. The court would just be applying the statute and trying to figure out whether, based on the evidence presented in the particular proceeding, a particular design was, in fact, designed to be fired from the shoulder. And speaking for myself, if you handed me the six factors, so to speak, and if I had an extension or a brace, there is no way I would be able to figure out whether my particular brace qualified or not. I mean, it doesn't, it gives you things to look at, but it doesn't say a surface area of X qualifies, so that I can run a surface area and try to determine, or a length pole of Y qualifies, but X doesn't qualify. In other words, how would somebody who, you know, wants to comply, take a look at their extension there and determine whether it qualified or not? So I think there's a couple things there. I think with many of these designs, how to apply these objective factors is going to be pretty obvious. So, for example, when it comes to the surface area, I mean, there's pictures in the record that a lot of these very common ones have surface area that looks exactly like a shoulder stock, and so you know that that's enough surface area. A lot of them... But it doesn't say six square inches or, you know, anything less than two square inches doesn't qualify, but anything greater does, or I mean, there's nothing definitive in it. So I don't think ATF could really reduce these to precise metrics, Your Honor. I mean, it's a qualitative question about whether the surface area permits shouldering, and I just don't think ATF would say, you know, here's the exact cutoff where, you know, at 1.9 inches, you can't shoulder, but at 2.1, you can. If I'm a person who has one of these and I'm trying to comply, how do I do it? Again, there's a couple things. Number one is, I think in many cases, applying these objective features are going to be pretty obvious, and what the features are looking at is, is your braced firearm really replicating a short-barreled rifle? Is it looking like a similarly designed short-barreled rifle? And I mean, the pictures in the brief in the rule, I think, make very clear that a lot of these popular products in the market look functionally identical to a short-barreled rifle. And then number two is, if you're unsure just from reading the rule, I think the second place to look would be to ATF. ATF released guidance contemporaneously with the rule to try to inform consumers of the most common products in the market. What do I have? I have 60 things that qualify as firearms and not a single one that doesn't. Well, again, I think the point of the slideshows was to tell people who had things that ATF thought were firearms that they should register those firearms to put them on notice. And so I think the first thing you would do is you would look and you would check the slideshows. If you couldn't look at your product and say, this looks exactly like a short-barreled rifle, obviously it's objectively designed in the same way. And then, I mean, the third thing, and again, I think this is really important, is you are free as a consumer or as a manufacturer to take issue with ATF's determination about any particular product. And so if you were genuinely unsure, I think the safest course would be to register the firearm and then to bring a suit. And there could be an individual suit post-registration. You said a moment ago that no one makes one of these things that doesn't qualify as a short-barreled rifle. So what's the... So everybody that has one, then, should register, right? So my understanding... You said that no one makes them because there's not a market for one that doesn't also serve as a shoulder. So my understanding is that there's not a real commercial market or hasn't been a real commercial market for the designs that ATF is describing in the rule that steer far clear from the NFA. You know, there may be individuals, there may be small markets for them, there may be individuals that have or have even made their own things that look like that. And I think they would be secure in knowing that they're not covered. That being said, if you disagree, if you think... If you look at your weapon and you think ATF is going to say this is a short-barreled rifle, but I don't think it is. I think the safest thing to do in that circumstance would be to register it and then... Well, to ask ATF, if you want, and then to register it and to bring a suit. And we can fight about particular designs. I mean, I think it's a very odd feature of this case that you have a brace manufacturer as a plaintiff here, and the brace manufacturer hasn't come into court and said, here are the 10 designs I make, and I don't think these are designed to be intended to be fired from the shoulder. And here's all the evidence I have that suggests that I actually designed these to brace for one-handed fire. That's just not... Is registration automatic? Is it just a matter of paying a certain dollar amount and saying, I have one of these? So there's a form that you have to fill out and submit. You can submit it online. And there's a tax. The tax was waived for individuals who had previously possessed these. But going forward, if you wanted to acquire a new one, you would have to pay the tax. And then you have to get approval from ATF. My understanding is that, as a general rule, assuming that you're not barred from possessing firearms, you get approved when you submit a form. But that's sort of the process. And so someone who had one of these before the rule, who was unsure, again, could have submitted the registration tax-free by filling out the form online, and then would be free to bring a challenge. Let me ask you this. If I had something that was clearly designed as a pistol, and I bought a brace and put the brace on it, and it's clearly a stock-type situation, it's deemed to be a firearm, what if I take it off? What if I take the brace off? What's the status then? So the rule doesn't address that moving forward. The statute provides that once you have a rifle, if you then make a firearm with a short barrel from that rifle, it continues to be a covered firearm. I think there's some persuasive value to the idea that the firearm can't sort of flip in and out of the NFA as you attach the brace or unattach the brace. But the rule doesn't address that. And the rule provides... But if it's flipping in, the question is, can it flip out? Right. And what I'm saying is that I think there's some persuasive value to the idea that once you have an NFA firearm, you can't sort of come in and out of the NFA every day as you take it in, as you take off or put back on the brace. And it's long been the case, and I don't think the plaintiffs dispute this, that you could buy a stock separately from a pistol, put the stock on the pistol, and now you have a rifle. That being said, ATF hasn't taken a position in the rule on how that would apply moving forward. As to people who have braces in the past, ATF provided in the rule that if you detached the brace and destroyed it or separated it, gave it away, you could continue to possess the pistol without it coming within the NFA as a matter of enforcement discretion. And I think ATF is very concerned in the rule, and you can look at the compliance options at waiving the tax, at letting you continue to possess the pistol without the brace, is very concerned with making sure that people who were misled or weren't sure about the status of their items before the rule have the ability in relatively costless ways to come into compliance with the statute moving forward. And that's obviously clear in the rule. And then just one final thing that I would say. I think that there's been some discussion about the criminal penalties here, and I do think it's important to remember that in any criminal prosecution, ATF or the government would have to prove beyond a reasonable doubt both that the firearm in question is designed to intend to be fired from the shoulder and that the individual possessing it had the requisite mens rea, which under staples would be that he or she knew of the features of the weapon that may have been designed to be fired from the shoulder. And so, you know, I think there's substantial backstops in the criminal context that would apply. If there are no further questions, I will ask the Court to adjourn. Thank you, Mr. Janda. A lot there potentially to respond to. I'll try to narrow it down to a few points. First of all, Judge Shepard, your question about the number of manufacturers, the counsel was correct. The record says there were five, but four would go out of business. I'm not sure what the current number is. Your Honor, you also asked about the number, I think you mean of braces, actual designs. Yes. I don't know, but there's a lot. And I do know that 17 of them were at one point approved, and then now none of those are approved anymore. There was a lot of discussion about what is not covered. And the government repeatedly goes back to these lines about, well, you just slap on some Velcro straps or you somehow make the rear surface area unshoulderable. I don't think, the government doesn't actually, well, first of all, the government says that might or may not be covered, so they're not even willing to say that that's going to be allowed. But the other thing is, I just think as a practical matter, they're sort of making something up and saying, well, if you put some straps on, it works. There's a reason the braces are designed the way they are, to function the way they do, and to sort of just sort of trivialize it with, well, if you put on some straps, you could be okay. I don't think it's practical or in any way relates to how the real world works here. With respect to the adjudications. I thought Mr. Janda said that was actually in the rule. Is he right about that? It's in the preamble, Your Honor. It talks about, it's sort of as an aside, as an examples of things you could do. And one was maybe if there were just straps and maybe if, I don't remember the precise language, but it made it uncomfortable to shoulder. I think Judge Smith refers to if you put a spike on it or something, I think he has a footnote about that. But that's, but no one knows because it hasn't been, it hasn't been identified. The adjudications, the pictures, I mean, I think I heard counsel say that they don't classify anything. They absolutely do. They say these are short-barreled rifles. It's in the language and there's no explanation for that as has been pointed out here. There was some talk about, you know, the overwhelming majority of these are used for shouldering. The elephant in the room is that we don't know how many are being used. The government says don't address the number being used correctly. And that's the fundamental problem that I was trying to make across all the arguments we make. That is a fundamental foundational problem to their whole case. There's also, you know, the government said a couple times about circumventing. I mean, the problem with that, you know, notably they don't say a single case for this concept of circumventing. And that's because there are none. And that's because it doesn't really make sense. You can't circumvent something that's not defined, right? So you have to start with defining something which isn't the case here. And I think counsel said, well, we can't give you metrics. Congress gave metrics. I mean, they say they're 16 inches for a barrel. So if it's 16.1 inches, that's not circumventing, that's complying. And so that's one of the points we're trying to make there. One second, please, Your Honor. One last thing I would just say is there was a couple more, a couple of references. I don't understand why people don't just go and submit these things for classification. Why is this suit brought by a manufacturer? That is what my client, SB Tactical, did for years, was submit these for classification. That's how lots of other manufacturers did, too. That's why you have 17 that were approved. And so I just wanted to make that clear, that this isn't somehow trying to avoid that. That's what we've been doing for years, and we're here now because of the rule. So unless Your Honors have any further questions, we would ask to grant a preliminary injunction and reverse the district court. Thank you. If you give a little time, I'll ask one last question. Oh, sure. If there is injunctive relief granted, what should the scope of it be? We've asked for nationwide relief, and we think that that's really the only appropriate way to do it, because it goes to complete relief for the plaintiffs. In this case, you have manufacturers, their whole supply chain is affected. Not just SB and B&T, the individual appellants, but also the members of FRAC. And then you have 25 states. So crafting it somehow narrower than nationwide with that many plaintiffs needing to be made whole, I don't know how you can do that practically. Is that what the Fifth Circuit did? The Fifth Circuit, Mock sort of suggested that a nationwide might be appropriate, but sent it back down for Judge O'Connor to take a first crack at it. And that's how they handled it. Very well. Thank you. Thank you. Court appreciated.